Approved: _____
SARAH MORTAZAVI
Assistant United States Attorney

Before:  HONORABLE HENRY B. PITMAN
United States Magistrate Judge
Southern District of New York

------------------------------------x

19MAG 6345

UNITED STATES OF AMERICA

    - v. -

GILBERT OLIVER, and
HUGHO WITTER,

            Defendants.

------------------------------------x

COMPLAINT

Violations of 21 U.S.C.
§ 846, 18 U.S.C.
§ 924(c)

COUNTY OF OFFENSE:
BRONX

STATE OF NEW YORK        ) ss:
SOUTHERN DISTRICT OF NEW YORK  )

    ADAM J. LAWLER, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA") assigned to the New York Field Division, and charges as follows:

COUNT ONE
(Narcotics Conspiracy)

    1.   From at least in or about June 2019, up to and including on or about July 8, 2019, in the Southern District of New York and elsewhere, GILBERT OLIVER and HUGHO WITTER, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

    2.   It was a part and object of the conspiracy that GILBERT OLIVER and HUGHO WITTER, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

1

3. The controlled substance that GILBERT OLIVER and HUGHO WITTER, the defendants, conspired to distribute and possess with intent to distribute was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

## COUNT TWO
(Firearms Offense)

4. On or about July 8, 2019, in the Southern District of New York and elsewhere, GILBERT OLIVER, the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, the drug trafficking conspiracy charged in Count One of this Complaint, knowingly did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm.

(Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5. I am a Special Agent with the DEA and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

6. Based on my participation in this investigation, including my review of reports and my conversations with other law enforcement officers, I am aware of the following, in substance and in part:

    a. Since in or about June 2019, the DEA has been investigating an individual later identified as HUGHO WITTER, the defendant. During the course of that investigation, the DEA

2

used a confidential source ("CS-1")[1] to communicate with an individual ("CC-1") regarding a cocaine transaction. Based on my training and experience and my participation in this investigation, and from my review of recorded calls between CS-1 and CC-1, I have learned that between on or about June 6, 2019 and on or about June 20, 2019, CS-1 and CC-1 had a series of recorded conversations in which they discussed, in substance and in part, CC-1 purchasing multiple kilograms of cocaine for distribution from CS-1.

      b. From my review of text messages sent to and from CS-1 in the course of arranging the cocaine transaction with CC-1 and his associates, I have learned that, on or about June 6, 2019, CC-1 sent CS-1 a text message with a particular telephone number ("Telephone-1"). I have also learned that, later that day, the user of Telephone-1 ("CC-2") sent CS-1 a text message with another telephone number ("Telephone-2") for CS-1 to contact.

      c. From my discussions with CS-1 and from my review of voice recordings and calls consensually recorded by CS-1, I have learned that on or about June 6, 2019, CS-1 contacted the user of Telephone-2, later identified as described below as HUGHO WITTER, the defendant, to discuss setting up a meeting in furtherance of the contemplated cocaine transaction.

      d. From my participation in this investigation, including my review of voice messages, recorded calls, and my conversations with CS-1, I have learned that, between on or about June 17, 2019 and on or about July 7, 2019, CS-1 and HUGHO WITTER, the defendant, had multiple calls discussing, in substance and in part, the amount and price of cocaine that WITTER would purchase from CS-1, and the date, time, and location for a meeting to complete the cocaine transaction.

      e. On or about July 6, 2019, during one of those recorded calls, CS-1 stated to WITTER, in substance and in part,

---

[1] Beginning in or about 2013, CS-1 provided information and proactive assistance to law enforcement in the hopes of receiving leniency at sentencing in connection with federal criminal charges related to narcotics conspiracy, armed robbery, and kidnapping, as to which CS-1 pled guilty pursuant to a cooperation agreement and was subsequently sentenced. CS-1 is currently providing information and proactive assistance to law enforcement in exchange for financial compensation. CS-1's information has proved reliable in the past and has led to convictions and the seizures of narcotics. CS-1's information has also been independently corroborated by, among other things, text messages and call recordings.

3

that CS-1 was calling from the Bronx and that CS-1 wished to meet in the Bronx that day. WITTER and CS-1 agreed, in substance and in part, that CS-1 and WITTER would meet on another day.

f.  From my participation in this investigation, including my review of recorded calls and my conversations with CS-1, I have learned that, between on or about July 7, 2019 and on or about July 8, 2019, CS-1 and HUGHO WITTER, the defendant, had multiple calls in which they discussed, in substance and in part, meeting to complete the planned cocaine transaction. WITTER and CS-1 agreed, in substance and in part, to meet at an address in Brooklyn, New York ("Address-1") at approximately 12 p.m. on July 8, 2019, so that WITTER could purchase five kilograms of cocaine from CS-1 at a price of $28,000 per kilogram.

7.  Based on my personal observations and my discussions with other law enforcement agents and CS-1, I have learned, in substance and in part, the following:

a.  On or about July 8, 2019, at approximately 1:30 p.m., CS-1 met with HUGHO WITTER, the defendant, at Address-1, as planned. WITTER drove to the meeting in a vehicle with a particular license plate (the "WITTER Vehicle"). From my participation in this investigation, I have learned that prior to this meeting, law enforcement agents provided CS-1 with several kilograms of a substance resembling cocaine (the "Sham Cocaine"), which was stored in a bag in the trunk of CS-1's vehicle (the "Vehicle").

b.  During CS-1's July 8 meeting with WITTER at Address-1, I observed WITTER and CS-1 enter the Vehicle and, at WITTER's direction, drive to a second location in Brooklyn ("Address-2"). Upon reaching Address-2, CS-1 and WITTER exited the Vehicle, walked into a nearby multi-story building, and entered a basement-level studio apartment within the building (the "Apartment"). CS-1 and WITTER met with an individual later identified as GILBERT OLIVER, the defendant, in the Apartment. While in the Apartment, OLIVER showed CS-1 stacks of cash and stated to CS-1, in substance and in part, that CS-1 should feel free to count the money. CS-1 and WITTER then exited the Apartment and walked back to the Vehicle, while OLIVER remained in the Apartment. Upon arriving at the Vehicle, CS-1 opened the trunk of the Vehicle and showed WITTER the Sham Cocaine contained in a bag in the trunk. WITTER then took the bag from

4

CS-1, and at that time agents who were surveilling Address-2 arrested WITTER.

        c. CS-1 then informed law enforcement agents, in substance and in part, that another individual, later identified as GILBERT OLIVER, the defendant, was in the Apartment with the cash intended for the narcotics purchase. Law enforcement agents proceeded to the Apartment and knocked on the door of the Apartment. Agents then heard what appeared to be an individual inside the Apartment securing a deadbolt on the door to prevent entry. Shortly thereafter, an agent at the rear of the Apartment heard what seemed to be an individual attempting to exit through a cellar door in the rear of Address-2. Law enforcement agents then entered the Apartment and observed, among other things, OLIVER attempting to exit through the rear of the Apartment with a plastic bag (the "Bag"). OLIVER was arrested and thereafter stated, in substance and in part, in a statement that was audio recorded, that he was the only individual who lived in the Apartment, that the guns and cash in the Apartment belonged to "the other guy," and that the agents could search the Apartment. Agents searched the Bag and found four firearms and approximately 2.5 kilograms of a substance that field tested positive for the presence of cocaine. Agents searched the Apartment and found approximately $140,000 cash -- consistent with the negotiated purchase price for five kilograms of cocaine, as discussed above -- in and around a duffel bag located in the living area of the Apartment, and approximately 120 grams of a substance that field tested positive for the presence of crack cocaine located in a kitchen cabinet.

        d. Following his arrest, GILBERT OLIVER, the defendant, was advised of and waived his *Miranda* rights and stated to agents, in substance and in part, that OLIVER did not know anything about drugs and that HUGHO WITTER, the defendant, had asked OLIVER if he could use OLIVER's apartment for a meeting.

        e. Following his arrest, HUGHO WITTER, the defendant, was advised of and waived his *Miranda* rights and stated to agents, in substance and in part, that: (1) another narcotics trafficking associate had told WITTER that CS-1 could supply cocaine to buyers; (2) WITTER expected to receive $500 per kilogram for every cocaine transaction WITTER facilitated; (3) WITTER had been corresponding with CS-1 in order to complete a narcotics transaction; and (4) GILBERT OLIVER, the defendant, was the buyer for the narcotics transaction WITTER had arranged with CS-1.

5

8. From my review of automated license plate reader records related to the license plate of the WITTER Vehicle, I have learned that on or about July 8, 2019, the WITTER Vehicle drove through Manhattan to Address-1 prior to meeting with CS-1 at Address-1.

WHEREFORE, I respectfully request that HUGHO WITTER and GILBERT OLIVER, the defendants, be arrested and imprisoned, or bailed, as the case may be.

_____
ADAM J. LAWLER
Special Agent
Drug Enforcement Administration

Sworn to before me this
9th Day of July, 2019

_____
THE HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

6







